Good morning, Your Honors. My name is Camille Becker. I'm with the Police of the Court. I'm representing Petitioner Prakash Rana. The crux of this case is based on the IGA's adverse credibility determination. The judge basically denied the case, despite his entire testimony being credible and finding nothing regarding the past persecution he suffered or any of the harm that he suffered in either Bhutan or Bhutan. He didn't take part of that testimony. Rather, he only found that the he speculated that the Petitioner in this case was not a citizen of Bhutan. And that decision was based on two speculative grounds. One is that he found that because he didn't speak Bhutanese, that he couldn't possibly have been from Bhutan. Well, the record says that it makes clear from the record makes clear that there are 100,000 citizens of Bhutan. He had a Nepalese passport, didn't he? He did have a Nepalese passport. Pretty good evidence that he was a citizen of Nepal. Well, Your Honor, the problem in this case is the judge didn't offer him an opportunity to explain. Every time he tried to explain how he got that fraudulent passport, he paid a high politician to get that passport when he was in. Didn't this was issued by the Nepalese consulate in Washington? The first passport he was issued was issued. But the one he had was issued in Washington, right? He renewed it in Washington. But we're dealing with the Nepalese government, the government of Nepal, Your Honor. We're not dealing with the Department of State. So the idea is he gets a fraudulent passport, and then the Nepalese consulate in Washington is so dumb that they use this forged passport to UMA. Correct. They're not going to run a background check and check his own. And you think it's irrational for the I.J. to not to buy that? I don't think it's irrational for him to question him. I just think that in this case he deprived him of his due process right to a fair hearing by not allowing him to explain. The Petitioner in this case. Well, you've just explained it, and I don't buy it. But he did not he wasn't able to produce any. First of all, he didn't know at all that this was at issue. From the very beginning, the government, in its notice to appear, alleged that he was a citizen of Bhutan. The judge, when the government pled to the notice to appear, the judge said that he designated Bhutan. He didn't mention Nepal. Later on, three times the judge warned him, I'm going to deport you to Bhutan. He didn't tell him that his citizenship was even in question until the very end of the hearing. The judge in this case was hiding the ball, if you will. He was waiting until the very end of the hearing, and then out of nowhere he starts scolding the Petitioner and wouldn't allow him to testify. This is really about a due process violation. This is less about whether the passport is valid or not, because he just didn't have a chance to present any evidence. He didn't know it was at issue. The government never asked one question about his Nepalese citizenship. In fact, they alleged in the notice to appear that he was a citizen of Bhutan. And at two times, in the December 10, 2004 hearing, the Petitioner tried to explain that he said, Your Honor, can I explain why I have this passport? And he said yes, and then he tried to explain, and the judge interrupted him. He wouldn't let him finish his testimony. That's at Administrative Record 126. Then the second time, on page 127, he said, I don't care how you got it. That's not really a – that's not at issue, he told him, on that page 127. And finally, at page 144, he said, I don't want to hear any more of this. It's very clear that this judge had his mind set up at the 11th hour of the hearing he was going to deny him a fair chance to a hearing. Okay? Thank you. We'll hear from the government. May it please the Court. My name is Ali Mamacheri. On behalf of the Respondent, United States Attorney General Eric H. Holder, Jr. Your Honors, the record does not compel the reversal of the agency's adverse credibility determination where the immigration – Why don't you go right to what he was just talking about? In other words, what about this thing on the passport? Did he give him – did the judge give the Petitioner a chance to explain it or not? The immigration judge did give Mr. Arana ample opportunity to explain how he obtained the Nepalese passport. First one or the second one or both? I believe both, Your Honor. The first one that he obtained, he indicated that he received in Nepal from a respected politician. Right. The immigration judge said, so you basically bribed this individual to give you a passport. But isn't – the more significant one, I would think, would be the second one. In other words, the one that he gets from the Nepal embassy here, wherever it was. Did the judge give him a chance to explain that? The – I cannot recall exactly if the judge gave him a chance to explain how he obtained the second Nepalese passport. But there was indication that this passport – there was discussion that it was received or it was obtained in the embassy in Washington and that it's valid until 2014. Okay. So is it – so all we've got is the fact that he got a passport from the Nepalese embassy. So how does the judge figure out that that has to be a sign of bad – no credibility as well? Yes, Your Honor. That's just one of the specific cogent reasons identified by the agency to support its adverse credibility determination. The most prevalent example is that Mr. Rana submitted an admittedly fraudulent, misleading document to establish his Bhutanese citizenship. The submission of this document, which contained handwriting that his unnamed friend – You say admittedly fraudulent. He admitted it was fraudulent. Which particular document? This is a document pertaining to his children's health records and the children's education records. The immigration judge asked him, where did you obtain these documents from?  The immigration judge pressed further, and then Mr. Rana said that I received these documents in the Damak refugee camp in Nepal. The immigration judge further asked, is this your handwriting on the document? And Mr. Rana replied, no, it is my friend. What is your friend's name? I do not remember something to that effect. And because this – Did he ask him to identify which of the handwriting on there was his friend's handwriting, he being the judge? Did the judge ask him to? He did not ask specifically where in the document. He just asked a general question, whose handwriting is this on the document, which Mr. Rana replied. The children's health records, though, have information on them about, you know, how much the kid weighed at various points in time. I mean, wouldn't it be normal on a form like that for a person to fill out part of it themselves and then the government person to certify? In other words, why is it admittedly fraudulent that the friend may have filled out part of the form if we don't really know which part he filled out? No. The immigration judge notes that the way that Mr. Rana's name is written on that document and the other three documents that he identifies in the record, he indicates that all these documents are written in the same manner, the way that Mr. Rana's name is written. So what's the – are we – is our role as judges reviewing this, do we just sort of take that at face value? I mean, I looked at it and there's – yeah, there's some similarities, but there's some differences, too. What's – Well, I think it's that he admits, Your Honor, that this – that these documents that are from the Bhutanese government, he later admits that, no, I obtained them in the Nepalese refugee camp and that they are filled out by an unnamed friend. Usually, government documents are not filled out by just random people in a refugee camp. I mean, this is an official document from the kingdom of Bhutan and he is saying that my unnamed friend filled out this information. And the immigration judge was able to compare the way that Mr. Rana's name was written on these documents, Exhibit 6 and Exhibit 6A. 6 and 6A, right. Correct. How that they were – the similarity in the way the name was written in the marriage certificate and the Bhutanese identification card. So back to my question, though. I mean, in other words, the judge says they're similar. We can look at those, too. Essentially, what's – how do we review that? Are we required to take what the immigration judge says essentially at face value? He says they're similar, therefore they are. Are we allowed to look at them ourselves? Well, the immigration judge under this – under circuit precedent is – he can make handwriting comparisons without having to consult a handwriting expert. I understand. Can't I, too, I guess is my question. I'm sorry, Your Honor. Can't I do – can I do the same thing? In other words, the Rs, for example, are not the same in all of these. They're distinctive in one or two of them and they're not in the others in the name of Mr. Rana. There's sort of this curlicue thing on some of them and there isn't on some of the others. And there are some other differences. So – Well, the immigration judge, as a fact finder, looked at these documents. And I believe the question you're asking is can – What I'm saying is that he doesn't have any more specialized knowledge than anybody else does. And so what degree of deference do we have to pay to that particular finding of his? Well, this is evidence – this is substantial evidence in the record, Your Honor. And it is clear that it supports the agency's adverse credibility determination. So what you're relying on here, it's really the two things. It's the passport and the handwriting thing. You've sort of chucked the Photoshop issue and you've chucked the thing about the discrepancies in the mother's name or whatever. The discrepancies in the mother's name, Your Honor, doesn't go to the heart of the claim. There is another point that the government does rely on in the fact that Mr. Rana, who claimed to have been born in Bhutan, spent 33 years living in Bhutan, could not speak a word of Bhutanese. That was another part of the IJ's adverse credibility determination. One of the people in this country that could fit that description, too. Right, Your Honor. But, again, just the immigration judge found it implausible that Mr. Rana, who admits to being a citizen of Bhutan, could not speak the Bhutanese language. Plus, he was even asked – or, excuse me, Mr. Rana even stated that he received instruction in school in the Bhutanese language. And the record evidence also indicates that the Kingdom of Bhutan, since the late 80s, was involved in a sort of national integration process to get all of its residents familiarized with the Bhutanese culture. He says that it was all after his time. And on the question of taking a language in school, there's plenty of people. We polled the courtroom, people who took two or three years of French or Spanish or whatever and can't speak a word of it now. I mean, the fact that there may have been some instruction in school doesn't strike me as a particularly good reason. Well, Your Honor, there's, again, three reasons that the agency relied on in its adverse credibility determination, and any one of these reasons is sufficient to support the agency's – That's a good segue into the only other question I had. So do we have to – so it's enough that there's one, but how significant does the one have to be, in other words? Is it any old one, no matter how insignificant, if it's supported by substantial evidence is good enough? Yes, Your Honor. As long as it doesn't compel the conclusion that Mr. Rana provided credible testimony, the fact that he admitted to providing a fraudulent, misleading document is sufficient in itself to support the agency's adverse credibility determination. I would just like to conclude by saying that because the adverse credibility determination is supported by substantial evidence, the court should uphold the agency's decision and deny Mr. Rana's petition for review. If there are no further questions, the Respondent respectfully rests. Thank you. Where in your brief do you raise the issue about denial of due process in failing to give him an opportunity to explain about the second passport? By citing Ordonez and the opportunity to explain cases, and I've also today supplemented with – No, no. Where in your blue brief do you make that argument? Well, it's – it would be contained in the citation. So Compass, Sanchez, V.I., and that's at page 13 in Ordonez. No, no. Where is the argument? Not whether the case is supported in the argument. Where is the argument? We understand in order to preserve an issue for appeal, you have to set it forth in your issues presented, and I don't see it there, except statement of issues, except perhaps in the vaguest way in talking about credibility determination. There's nothing about due process violation or failure to give an opportunity to explain, but skipping over that on the theory that maybe some of those are vague enough to contain it, I'm now looking at the brief and I try to find it. I don't think – I think the argument here has been – the argument in the brief is that he's been deprived of a fair trial. It's done – it doesn't actually mention due process, but that's essential. So why isn't that issue waived? Because it's contained in the argument that he was deprived of a reasonable opportunity to explain. I want you to bring me a page and a line to read that you say contains that argument. You understand the issue has to be fairly presented in the brief. Sure. To preserve it for appeal. Otherwise, the government doesn't have a chance to respond to it in its brief, and then maybe it's not prepared to discuss it at the oral argument. And we've got lots of cases that say that if you fail to raise it in the opening brief, the issue just simply isn't part of the appeal. It's waived. It's not – it's not an issue on which we can – which we can rule. Sure. So what page and what – Page 13. Okay. When we're – when we talk about in the brief when it's discussed about how the IG failed to give Fisher a reasonable opportunity to explain the alleged discrepancies. I'm sorry. I'm looking at page 13. The first full paragraph. The first full sentence. That's such a finding. Thus? So that statement, supported by the two cases, preserved the issue on appeal. I'm sorry. What statement? That statement, that first sentence. The first sentence? So even if the IG's decision were based on substantial evidence, which is argued that it's not, the judge failed to give Petitioner a reasonable opportunity to explain the alleged discrepancies and the explanation that Petitioner gave was not given proper weight. So by not allowing him that opportunity to explain, then – and also citing it by case law that actually talks about the fair trial, that is preserved on appeal, I believe, Your Honor. But I don't see where you relate that to the passport issue. I mean, there's a general statement following the discussion with the passport that's two or three pages earlier. Today you make an argument. You say, look, he was not given a chance to explain. He was – about the passport. I just don't remember seeing it in the brief where that was – where that was discussed. And you don't cite any place in the hearing or the transcript where the issue is taken up by the I.J. and your client is not allowed to speak. It's not anywhere in the brief. I'm just wondering where this is represented. Well, it's also incorporated in the firmly resettlement part. When he tries to explain about the – whether or not he was firmly resettled and he was going to the citizenship issue, at that point the judge interrupted him and – But this is a different issue. This is firm resettlement. I'm sorry? This is not firm resettlement. This is credibility on the passport and whether or not – They're very intertwined, though. I mean, the firm resettlement issue is also part and parcel of the passport issue. You can't really separate the two of them because if you – Where is that in your brief? That's going to be at – the firm resettlement issue is at page 19. No, no, no. I know the firm resettlement issue, but where in the discussion of the firm resettlement issue are you relying? So we're talking here on page 21, the first full paragraph of that page. He failed to – The I.J. clearly erred when he failed to permit the petitioner from fully explaining why he did not firmly resettle in Nepal and why he would not be able to return to Nepal to obtain permanent immigration status. It talks about the false passport, and then it says that he interrupted him and told him, I don't want to hear any more of this. So it's very clear. And the government responded to this in their brief, Your Honor. So it's not as if we – the issue wasn't raised. They very much responded to this issue in their brief and said that it wasn't relied on speculation and he did have an opportunity to explain. That's what they said in their reply brief. So it is raised and it has been responded to. But you don't contend that he had an inadequate opportunity to explain how he got the records about his kid's medical condition and education. I just don't think the judge considered the explanation. That's not my question. My question is, you don't contend that he didn't have an adequate opportunity to explain that, because he actually said how he got the documents. Well, he said that he got them from the refugee camp. He didn't admit that they were fraudulent. Contrary to what the government said. I understand, but he did say a friend. He got them at the refugee camp and a friend wrote it out. That doesn't necessarily mean that he's admitting that it's fraudulent, though. Well, it does suggest rather strongly that it was not obtained from the Bhutan government. I get school records all the time from my office in San Francisco. That doesn't – Help us on Lucas. Well, we're also dealing with the government of Bhutan, where you – as Judge Connelly mentioned, that oftentimes you will be asked to fill in some of these documents. So why is it strange that your friend would fill in part of a handwritten form for a government officer to validate? That's actually quite common, especially in places like these Asian countries. It's not as formalized and certified as it is in the United States. And we have to consider that. Okay. Thank you. Thank you.
judges: Kennelly, Kozinski, Rymer